The STATE of Ohio, Appellee,

v.

McCRAY, Appellant.*

[Cite as *State v. McCray* (1995), 103 Ohio App.3d 109.]

Court of Appeals of Ohio,
Ninth District, Medina County.

Nos. 2346–M, 2361–M.

Decided April 19, 1995.

---

* Reporter's Note: A discretionary appeal to the Supreme Court of Ohio was not allowed in (1995), 73 Ohio St.3d 1450, 654 N.E.2d 986.

*Dean Holman,* Medina County Prosecuting Attorney, and *John Dolatowski,* Assistant Prosecuting Attorney, for appellee.

*Gerald A. Messerman,* for appellant.

QUILLIN, Presiding Judge.

Eric McCray appeals from his convictions of aggravated murder, murder, kidnapping, obstruction of justice and tampering with evidence. We affirm.

Upon appeal, McCray presents several challenges regarding evidentiary rulings made by the court below and raises issues of prosecutorial and judicial misconduct. Although McCray does not challenge the sufficiency or weight of the evidence which supports his conviction, we nevertheless rely in part on the abundance of admissible evidence supporting McCray's conviction to affirm McCray's convictions, a summary of which is contained in the following.

The prosecution presented evidence establishing that Eric McCray, Christopher Grodek and Anthony Martin devised a plan wherein they would kill Adam Rodgers so that Grodek, who was AWOL from the Army, could assume Rodgers's identity. While in Virginia with Rodgers, Grodek had an identification card made which contained his photograph and Adam Rodgers's name. On Sunday evening of August 29, 1993, McCray picked up Rodgers at Rodgers's home and took him to the Arabica coffee store in Parma, where Grodek and Martin were waiting. Rodgers was under the impression that the four men were going to go "drinking." After picking up some beer, McCray drove Rodgers, Grodek and Martin to a secluded baseball field in Hinckley. McCray drove his car as far back into the field as possible and parked. The four men exited McCray's car and Grodek picked up a wooden board which was approximately the size of a baseball bat. For a short time, Grodek and McCray mimicked military maneuvers with the board, using it in the place of a rifle.

The four men walked around the baseball field and drank. During this time, McCray continued to carry the board. After walking around the field for a short

time, McCray struck Rodgers from behind with the board. Grodek then took the board from McCray and struck Rodgers with it between forty and fifty times about the head and face. After he was done bludgeoning Rodgers, Grodek pulled out a pocket knife and tried to stab Rodgers in the neck. During this time, McCray ran back to his car and returned with a steak knife. McCray then handed the knife to Martin and told him to cut Rogers's throat. Martin complied. Martin then handed the knife back to McCray, who wiped the blood off of the knife and onto his shirt. Grodek and McCray dragged Rodgers's body into the woods. McCray then drove back to Parma and dropped off Grodek and Martin at the Arabica. After dropping off Martin and Grodek, McCray went to Denny's restaurant in Parma and disposed of the board in a Denny's trash dumpster.

During the course of the next several days, Grodek sold Rodgers's automobile and cashed his paycheck. Additionally, Grodek, McCray and Martin told several of their friends about the murder. Until their apprehension, Grodek, McCray and Martin all continued to associate, meeting behind a Finast grocery store and at the Northwind Inn in Parma to drink alcohol and smoke marijuana.

In proving its case, the prosecution presented the testimony of Anthony Martin. Martin, pursuant to a plea bargain, testified to his personal observation and participation in the crime. Martin denied participation in the planning of Rodgers's murder. Nonetheless, he testified that on the evening of August 29, before the murder, he approached Grodek and McCray as they sat on a wall outside the Arabica coffee store in Parma. Martin asked Grodek and McCray what they were talking about and Grodek answered that "they were talking about killing Adam [Rodgers]." Additionally, although he denied actually seeing McCray strike Rodgers with the board, Martin testified that, while walking around the baseball field, he heard a loud thud. Martin turned around and observed that McCray was holding the board in his hand and that Rodgers was staggering. Finally, Martin testified that after Grodek finished beating Rodgers, McCray gave Grodek a pat on the back, retrieved a steak knife from his car, and told Martin to cut Rodgers's throat. The prosecution also presented the testimony of Christopher Birch. Birch testified that he spoke with McCray about the murder of Adam Rodgers on August 31, 1993. Birch's testimony regarding his conversation with McCray corroborated Martin's account of the murder, as it relates to McCray, in all significant respects. Additionally, Birch testified that McCray told him that, before the murder, McCray had been privy to a "foolproof" plan conceived by Grodek wherein they would kill Rodgers and Grodek would assume his identity. Prosecution witness, Shawn Wallace, further corroborated Birch's testimony when he testified that McCray told him that he struck Rodgers first because Grodek felt bad about delivering the initial blow.

The prosecution also presented the testimony of Hinckley Police Detective Virginia Yates. Yates interviewed McCray on September 4, 1993, regarding the discovery of Adam Rodgers's body. Yates testified that during the course of that interview, McCray admitted to prior knowledge of the plan to kill Rodgers, to his participation in the murder of Rodgers, to helping Grodek drag Rodgers's body into the woods, to cleaning up the crime scene and to disposing of the murder weapon in a Denny's dumpster.

In addition to the testimony of Martin, Birch, Wallace and Yates, the prosecution presented the testimony of several other witnesses who corroborated the aforementioned testimony. Upon consideration of this evidence, McCray was found guilty of murder, aggravated murder in the commission of a kidnapping, kidnapping, obstruction of justice and tampering with evidence. McCray appeals from his convictions, asserting the following assignments of error.

### Assignment of Error I

"In violation of Rule 404(B) of the Rules of Evidence, the trial court erroneously permitted the introduction of evidence of uncharged acts of alleged misconduct wholly unrelated to the offenses charged."

Initially, McCray asserts that it was error for the trial court to allow the state to introduce evidence regarding McCray's alleged drug use, poor work ethic, propensity for theft and other traits which McCray contends were designed to demonstrate McCray's overall moral degeneracy. Evid.R. 404 governs the admissibility of character evidence, stating:

"(A) Character evidence generally. Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, subject to the following exceptions:

"Character of accused. Evidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same is admissible[.]"

Upon review, we believe that some of the statements offered by the prosecution during its case in chief were admissible under Evid.R. 404(B), which states:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

For instance, during direct examination of Christopher Birch, the prosecution asked Birch whether there was talk in his group about the "rush that someone must get from killing someone." Defense counsel objected to this question and

the court required the prosecutor to define the "group" and the "time frame" involved in these discussions. The group was defined to include McCray and the time frame was narrowed to the summer of 1993. Birch then stated that the group used to talk about "the different serial killers * * * and what a rush it must be to actually take someone's life; [and] * * * how intense it must be to know that you're playing God with that person." Clearly, this evidence was admissible under Evid.R. 404(B) as proof of intent or motive.

Further, on appeal McCray presents questions propounded by the prosecutor on direct examination of its witnesses to which the court sustained timely objections made by defense counsel. The prosecutor asked Christopher Birch whether he knew if Eric McCray hung around burial mounds. Defense counsel objected and the court sustained the objection, prohibiting the witness from answering the question. The prosecutor asked Anthony Martin whether he knew if McCray steals. Defense counsel objected and Martin was prevented from answering the question.

■ Finally, although other testimony regarding McCray's appearance, work history and drug use were admitted over defense counsel's objections, the trial court enjoys broad discretion in the admission and exclusion of evidence and will not be reversed absent a clear abuse which materially prejudices the objecting party. *Barbeck v. Twinsburg Twp. Bd. of Trustees* (1992), 73 Ohio App.3d 587, 597 N.E.2d 1204. Even if we were to assume such evidence was improperly admitted, such admission is harmless in light of the overwhelming properly admissible evidence offered by the prosecution to prove McCray's guilt. See *State v. Williams* (1988), 38 Ohio St.3d 346, 351, 528 N.E.2d 910, 917. Accordingly, appellant's first assignment of error is overruled.

### Assignment of Error II

"In violation of [Evid.R.] 405(A), the trial court erroneously permitted cross-examination of defense character witnesses on facts wholly irrelevant to the opinion testimony offered by such witnesses regarding appellant's reputation for peacefulness and nonviolence."

■ In his second assignment of error, McCray asserts that it was error for the trial court to allow the prosecutor to cross-examine McCray's character witnesses regarding their knowledge of McCray's drug use, prior thefts and interest in the occult. Further, McCray asserts that it was error for the trial court to allow the prosecutor to require character witnesses to assume facts which the prosecution had the burden of proving at trial as true and questioning the witnesses whether, assuming the truth of such facts, their opinion of McCray would change. We agree that the trial court committed error in allowing the

prosecutor to overstep the permissible scope of cross-examination under Evid.R. 405(A). However, in light of the overwhelming weight of admissible evidence of McCray's guilt, we do not believe that such error constitutes grounds for reversal.

Defense counsel called twelve character witnesses on McCray's behalf. Each character witness gave opinion or reputation testimony regarding McCray's positive character for peacefulness and nonviolence. After McCray "opened the door" by introducing evidence of his good character, the prosecutor was permitted to cross-examine each character witness regarding relevant specific instances of McCray's conduct. Evid.R. 405(A). As stated by the First District Court of Appeals in *State v. Howard* (1978), 57 Ohio App.2d 1, 9, 11 O.O.3d 3, 7, 385 N.E.2d 308, 314:

"A character witness may be cross-examined as to the existence of reports of particular acts of the person about whom he has testified which are inconsistent with the reputation attributed to him by the witness—not to establish the truth of the facts, but to test the credibility of the witness and to ascertain what weight or value is to be given to his testimony. *State v. Elliot* [*Elliott*] (1971), 25 Ohio St.2d 249 [54 O.O.2d 371, 267 N.E.2d 806]. Proper cross-examination in this respect concerns other acts or misdeeds on the part of the defendant involving those character traits referable to the crime for which the defendant is on trial. *State v. Polhamus* ( [App.] 1951), 62 Ohio Law Abs. 113 [106 N.E.2d 646]. See Annotation, 47 A.L.R.2d 1258 *et seq.* (1956)."

It is clear from the record that, over the objections of defense counsel, the prosecutor was allowed to overstep the permissible scope of cross-examination with respect to several of McCray's character witnesses. Many of McCray's character witnesses gave testimony on direct examination limited to McCray's character for peacefulness and nonviolence. The prosecutor cross-examined these witnesses with questions of specific act conduct of the defendant relating to drug use, prior acts of theft and interest in the occult. While it is true that a few of McCray's character witnesses testified regarding character traits possessed by McCray which are broader in scope than peacefulness and nonviolence, such testimony did not open the door for the prosecutor to attack every other character witness on McCray's negative character traits unrelated to peacefulness and nonviolence. The purpose of allowing cross-examination on specific acts of the defendant's conduct is to test the credibility of the defendant's character witness in relation to that which the witness has testified. Therefore, several of the questions posed by the prosecutor to McCray's character witnesses were not the proper subject of cross-examination under Evid.R. 405(A). See *Michelson v. United States* (1948), 335 U.S. 469, 484, 69 S.Ct. 213, 222, 93 L.Ed. 168, 178.

On cross-examination, the prosecutor was additionally allowed over continual objections to ask McCray's character witnesses to assume the truth of facts which the prosecution had offered at trial relating to McCray's participation in the murder of Rodgers and to relate to the jury whether those facts would alter their opinion of McCray. The prosecution argues on appeal that such questions posed on cross-examination were properly admissible due to the fact that McCray's defense witnesses testified regarding their personal opinion of McCray's character for peacefulness and nonviolence, rather than McCray's reputation in the community with regard to those character traits. In support of its argument, the prosecution cites *United States v. White* (C.A.D.C.1989), 887 F.2d 267. In *White,* then-circuit Judge Ruth Bader Ginsberg wrote the majority opinion for the court, interpreting identical Fed.Evid.R. 405 as follows:

"Cross-examination of witnesses who testify only to the defendant's community reputation with hypotheticals assuming guilt may be improper. * * * However, similar cross-examination of witnesses who—as the witness did here * * *—give their own opinion of the defendant's character is not error." *Id.* at 274–275.

In *United States v. Williams* (C.A.7, 1984), 738 F.2d 172, however, the Seventh Circuit Court of Appeals refused to apply a distinction between reputation and opinion character witnesses who were asked if their opinion of the defendant would change if they were to assume that the defendant committed the acts for which he was on trial. The *Williams* court reasoned that allowing such questions to be asked of defense character witnesses over objection is error as such questions assume "away the [defendant's] presumption of innocence." *Id.* at 177; see, also, *United States v. Morgan* (C.A.2, 1977), 554 F.2d 31, 34 (allowing the prosecution to cross-examine an expert character witness with questions which require the witness to assume facts in evidence in the case, but stating in dictum that it would disapprove of such questions being asked of a nonexpert character witness). At present, there is very little guidance on how Ohio courts will interpret Evid.R. 405(A) with respect to this issue.

Even if we were to assume that it was error for the trial court to allow the prosecutor to cross-examine McCray's character witnesses in the aforementioned manner, the overwhelming weight of properly admissible evidence offered by the prosecution at trial would lead us to the conclusion that such error was harmless.

Appellant's second assignment of error is overruled.

### Assignment of Error III

"The trial court, in violation of Rules 701 and 702 of the Ohio Rules of Evidence, erroneously admitted lay opinion testimony and excluded expert opinion testimony on critical factual issues."

Under his third assignment of error, McCray argues that the trial court admitted impermissible lay opinion testimony into evidence over defense counsel's objections. Evid.R. 701 governs the admission of opinion testimony by lay witnesses, stating:

"If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue."

■ McCray argues that it was error for the trial court to allow opinion testimony by law witnesses in the following instances: (1) a number of prosecution witnesses testified that McCray did not appear fearful of Grodek when they observed McCray with Grodek after Adam Rodgers was murdered; (2) Anthony Martin stated that he was present when McCray struck Rodgers with a board, the sound of which appeared hard enough to knock someone over; (3) Detective Virginia Yates testified regarding McCray's inappropriate behavior during an interview after the murder was committed.

A review of the trial transcript reveals that all of the prosecution witnesses based their perceptions on personal observation of McCray and that, in each instance, the witness's observation was helpful to the jury with regard to the determination of a fact in issue, or a clear understanding of the witness's testimony.

■ McCray additionally argues that it was error for the trial court to exclude expert testimony that McCray suffered from posttraumatic stress syndrome from witnessing the killing of Adam Rodgers. The trial court excluded the expert testimony, holding that the expert would be permitted to testify regarding the posttraumatic stress syndrome if the case reached the mitigation phase, but that such evidence was not relevant to the guilt phase of trial. A review of the expert's proffered testimony reveals that the defense would have introduced psychological evidence that McCray suffered from posttraumatic stress syndrome after witnessing the death of Adam Rodgers. Clearly, psychological trauma which is experienced only after a murder has been committed would not offer a defense, justification or excuse to a defendant's participation in that murder. Further, Ohio does not recognize a partial defense of diminished capacity; a defendant may not offer psychiatric testimony, unrelated to the insanity defense, to show that the defendant lacked the mental capacity to form the specific mental state required for conviction of a crime. *State v. Wilcox* (1982), 70 Ohio St.2d 182, 24 O.O.3d 284, 436 N.E.2d 523, paragraphs one and two of the syllabus. Even the affirmative defense of duress cannot justify the taking

of an innocent life. See *State v. Metcalf* (1977), 60 Ohio App.2d 212, 215, 14 O.O.3d 186, 188, 396 N.E.2d 786, 789.

■ Although evidence of posttraumatic stress syndrome suffered by McCray after witnessing the murder of Rodgers might have been consistent with the defense theory that McCray was an unwilling participant in Rodgers's murder and may have corroborated the defense's explanation concerning why McCray continued to associate with Grodek after the murder, the court could have found that such evidence, offered as circumstantial proof of McCray's innocence, would have acted to confuse the issues or mislead the jury. Evid.R. 403(A). Finally, McCray does not direct this court to any other possible use of the psychological evidence which would add to its probative value. Upon review, we are unable to say that the trial court abused its discretion in excluding the proffered testimony.

Appellant's third assignment of error is overruled.

### Assignment of Error IV

"The trial court, by allowing the prosecution to place his own credibility in issue from voir dire through closing argument, by allowing the prosecutor to repeatedly lend his personal credibility and the credibility of his office to bolster the testimony of prosecution witnesses, and by allowing the prosecutor to assert personal knowledge and opinions of critical facts in issue, denied the appellant the right to a fair trial."

■ Under his fourth assignment of error, McCray points to several comments made by the prosecutor during the course of trial which McCray apparently argues constituted prosecutorial misconduct of such a magnitude as to warrant reversal. Initially, McCray argues that the prosecution impermissibly bolstered the credibility of prosecution witness, Anthony Martin, in voir dire and in closing argument. Specifically, McCray contends that the prosecutor repeatedly asked jurors during voir dire whether they would discount Martin's testimony because he had received a deal from the prosecution and that, during closing arguments, the prosecutor stated that deciding which of the three actors in Rodgers's death was to receive a deal was difficult. When McCray's trial counsel objected to the prosecutor's comments during voir dire examination, the court stated that it would instruct the jurors on how to view accomplice testimony. Additionally, in response to defense counsel's objection, the court advised the jury that statements of accomplices are to be viewed "with a lot of doubt." Before the jury retired for deliberations, the judge charged the jury as follows:

"You have heard testimony from Anthony Martin, another person who pleaded guilty to some of the same crimes charged in this case and whom is said to be an accomplice.

"An accomplice is one who knowingly joins another in the commission of a crime. Whether Anthony Martin was an accomplice and the weight to give his testimony are matters for you to determine.

"Testimony of a person whom you find to be an accomplice should be viewed with grave suspicion and weighed with great caution."

In light of the court's instructions, we are unpersuaded that the prosecutor's remarks regarding Martin's plea bargain during voir dire and closing argument impermissibly bolstered Martin's credibility and acted to deny McCray a fair trial.

McCray additionally alleges that the prosecutor impermissibly expressed his opinion concerning McCray's lack of credibility as well as the lack of credibility of several other defense witnesses to the jury several times during the course of trial. While it is impermissible for a prosecuting attorney to express his personal belief or opinion as to the credibility of a witness, *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 319, 470 N.E.2d 883, 885, to constitute reversible error such statements must act to deprive the defendant of a fair trial. *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 24, 514 N.E.2d 394, 400.

Initially, we note that unlike *Smith, supra,* or *State v. Thayer* (1931), 124 Ohio St. 1, 176 N.E. 656, the case upon which *Smith* relies, we are not confronted with a situation where the prosecutor conveyed to the jury that his opinions or beliefs were based on knowledge outside the evidence presented at trial. To the contrary, in nearly every example brought to this court's attention by McCray, the prosecutor was basing his opinion on facts in evidence. For instance, during closing arguments the prosecutor stated:

"Folks, at the field where Adam Rodgers was killed, Eric hit Adam Rodgers. He admitted that to Detective Yates. He tries to claim that it's an accident. The evidence shows it's a lie. He lied about so much."

McCray additionally points out that statements made by the prosecutor during closing argument referring to McCray's defense as a "facade" and a "smokescreen" are strikingly similar to those statements that the court found to constitute grounds for reversal in *Smith.* However, in *Smith,* unlike the case *sub judice,* the prosecutor additionally intimated that defense counsel had "suborned perjury by manufacturing, conceiving and fashioning lies to be presented in court." *Id.,* 14 Ohio St.3d at 14, 14 OBR at 319, 470 N.E.2d at 885.

Additionally, a review of the transcript of proceedings reveals that, upon the objection of defense counsel, the court admonished the prosecutor before the jury for commenting upon the credibility of a witness on at least one occasion and instructed the jury that they were the sole judges of the credibility of witnesses

and that opening and closing statements of counsel are not to be considered as evidence.

Finally, in light of the fact that several of the prosecutor's statements claimed by McCray to constitute prosecutorial misconduct received no objection at trial and that overwhelming properly admissible evidence of McCray's guilt was offered by the prosecution, McCray's fourth assignment of error must be overruled. "It is the duty of a reviewing court to consider the trial record as a whole and ignore errors that are harmless including most constitutional violations." *State v. Lott* (1990), 51 Ohio St.3d 160, 166, 555 N.E.2d 293, 301, citing *United States v. Hasting* (1983), 461 U.S. 499, 508–509, 103 S.Ct. 1974, 1980–1981, 76 L.Ed.2d 96, 106.

## Assignment of Error V

"By stating, in the presence of the jury, that appellant was a co-conspirator with the other two persons already convicted of the murder charged in the indictment, the trial court impermissibly invaded the province of the jury and denied appellant a fair trial."

 Upon the prosecution's direct examination of Anthony Martin, Martin began to testify about a statement which had been made by Grodek. Defense counsel offered an objection to the testimony. In response to defense counsel's objection, the court stated "[Martin is] a co-conspirator. He's allowed to talk about what a co-conspirator [Grodek] says or does." McCray does not challenge the court's evidentiary ruling, but states that the court's ruling, given before the jury, amounted to a judicial declaration of his guilt.

In each of the cases cited by McCray in support of his fifth assignment of error (*State ex rel. Wise v. Chand* [1970], 21 Ohio St.2d 113, 50 O.O.2d 322, 256 N.E.2d 613; *State v. Kay* [1967], 12 Ohio App.2d 38, 41 O.O.2d 91, 230 N.E.2d 652) the trial court undertook a continuous and pervasive course of questioning and comment before a jury which had the effect of suggesting judicial partiality. In the case *sub judice*, we are faced with a single comment, consisting of a brief explanation of an uncontested evidentiary ruling. Further, when viewed from the eyes and ears of the jury, the trial court's explanation of its evidentiary ruling did not implicate McCray as a co-conspirator. The court was commenting upon Martin's in-court statement regarding what had been previously said by Grodek. The court's statement, at most, would have the appearance of labeling Martin and Grodek as co-conspirators. It is only with a deeper understanding of the rules of evidence, not likely to be possessed by members of the jury, that the court's ruling implicates McCray as a co-conspirator.

McCray's fifth assignment of error is overruled.

The judgment of the trial court is affirmed.

*Judgment affirmed.*

REECE and DICKINSON, JJ., concur.